IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-115

No. 292A20

Filed 24 September 2021

STATE OF NORTH CAROLINA

v.

DONALD EUGENE HILTON

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 271 N.C. App. 505, 845 S.E.2d 81 (2020), affirming in part, reversing in part, and remanding an order entered on 10 May 2018 by Judge Daniel A. Kuehnert in Superior Court, Catawba County. On 23 September 2020, the Supreme Court allowed defendant's petition for discretionary review as to additional issues and the State's petition for discretionary review. Heard in the Supreme Court on 17 May 2021.

*Joshua H. Stein, Attorney General, by Joseph Finarelli, Special Deputy Attorney General, for the State-appellee.*

*Glenn Gerding, Appellate Defender, by Nicholas C. Woomer-Deters, Assistant Appellate Defender, and James R. Grant, Assistant Appellate Defender, for defendant-appellant.*

NEWBY, Chief Justice.

¶ 1    The Supreme Court of the United States held that North Carolina's satellite-based monitoring (SBM) program effects a Fourth Amendment search. As such, the imposition of SBM on a limited category of sex offenders is constitutional so long as

it is reasonable. "The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Grady v. North Carolina* (*Grady I*), 575 U.S. 306, 310, 135 S. Ct. 1368, 1371 (2015) (per curiam). The Fourth Amendment reasonableness test requires balancing significant competing interests: the State's interest in protecting children and others from sexual abuse and a convicted sex offender's right to privacy from government monitoring.

¶ 2        Upon remand from the Supreme Court's *Grady I* order, this Court held the SBM program to be unconstitutional as applied to the narrow category of individuals "who are subject to mandatory lifetime SBM based solely on their status as a statutorily defined 'recidivist' who have completed their prison sentences and are no longer supervised by the State through probation, parole, or post-release supervision." *State v. Grady* (*Grady III*), 372 N.C. 509, 522, 831 S.E.2d 542, 553 (2019) (footnote omitted). Our *Grady III* decision, however, left unanswered the question of whether the SBM program is constitutional as applied to sex offenders who are in categories other than that of recidivists who are no longer under State supervision.

¶ 3        Defendant here is not a member of the category contemplated in *Grady III*. Rather, he falls into the aggravated offender category, which consists of defendants who are subject to SBM due to their conviction of at least one statutorily defined "aggravated offense." A limited number of very serious sexual offenses such as rape

are categorized as aggravated. Defendant's crime being one of the most serious sex offenses impacts our weighing of the reasonableness factors, including society's interest in protecting its most vulnerable members and the expectation of privacy that society recognizes as legitimate. As such, the task here is to determine whether the SBM program[1] is constitutional as applied to aggravated offenders.

¶ 4    For guidance, the Supreme Court has provided two examples for conducting the Fourth Amendment reasonableness test in the context of categorical searches. *Grady I*, 575 U.S. at 310, 135 S. Ct. at 1371 (citing *Samson v. California*, 547 U.S. 843, 857, 126 S. Ct. 2193, 2202 (2006) (suspicionless search of parolee was reasonable); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 664–65, 115 S. Ct. 2386, 2396 (1995) (random drug testing of student athletes was reasonable)). Having conducted the reasonableness analysis in light of *Samson, Vernonia,* and our prior decision in *Grady III*, we conclude that searches effected by the imposition of lifetime SBM upon aggravated offenders are reasonable. We also conclude that the SBM program does not violate Article I, Section 20 of the North Carolina Constitution. The trial court's order imposing lifetime SBM based upon defendant's status as an aggravated offender thus complies with the Fourth Amendment and Article I, Section

---

[1] The General Assembly recently amended the SBM program. *See* Act of Sep. 2, 2021, S.L. 2021-138, § 18, https://www.ncleg.gov/Sessions/2021/Bills/Senate/PDF/S300v8.pdf. The relevant amendments, however, do not become effective until 1 December 2021. *See id.* § 18.(p). Therefore, the version of the SBM program in effect on the date of the trial court's SBM order governs the present case.

20. Accordingly, we (1) modify and affirm the portion of the decision of the Court of Appeals which upheld the imposition of SBM during post-release supervision and (2) reverse the portion of the decision which held the imposition of post-supervision SBM to be an unreasonable search. Therefore, the trial court's SBM order is reinstated.

## I.     Facts and Procedural History

During an interview with a criminal investigator on 8 June 2005, defendant admitted to having sexual intercourse with one minor child and sexual contact with another while a third minor child watched. On 5 July 2005, defendant was charged with first-degree statutory rape and first-degree statutory sexual offense. On 26 April 2007, he pled guilty to the charges and received a sentence of 144 to 182 months. Defendant was released from prison on 9 July 2017 and placed on post-release supervision for a period of five years. Defendant's post-release supervision terms prohibited him from leaving Catawba County without first obtaining approval from his probation officer. Defendant, however, traveled to Caldwell County on several occasions without his probation officer's consent. While in Caldwell County, defendant sexually assaulted his minor niece. As a result, defendant was charged in Caldwell County with taking indecent liberties with a child.[2]

The trial court in Catawba County conducted a hearing on 19 April 2018 and

---

[2] Subsequent to the SBM order in this case, defendant was convicted of this indecent liberties charge.

10 May 2018 to determine whether defendant should be enrolled in SBM based upon his 2007 convictions. Finding that defendant "[fell] into at least one of the categories requiring [SBM] under [N.C.]G.S. [§] 14-208.40, in that . . . the offense of which . . . defendant was convicted was an aggravated offense," the trial court ordered defendant to enroll in lifetime SBM. In support of its order, the trial court made the following additional findings:

> l. That the defendant admitted to sexually assaulting more than one minor child prior to being convicted of first degree rape and first degree sexual offense.
>
> 2. That the defendant [completed his prison sentence] for the crimes of first degree rape and first degree sexual offense[.]
>
> 3. That probable cause has been found to currently charge the defendant with the crime of taking indecent liberties with a minor.
>
> 4. That the defendant was charged with this crime just a couple months after being released from custody from serving his sentence for the crimes of first degree rape and first degree sexual offense.
>
> 5. That the alleged victim in the pending charge is related to one of the victim's [sic] associated with the defendant's previous convictions of first degree rape and first degree sexual assault.
>
> 6. That the defendant has been monitored by probation and parole since his release from prison on July 9, 2017.
>
> 7. That one of the conditions of defendant's post release supervision is not to leave Catawba County without the permission of his probation/parole officer.

8. That the defendant has violated this condition of post release supervision and has traveled to Caldwell County without the knowledge of probation and parole.

9. That defendant's current charge of taking indecent liberties with a minor is out of Caldwell County were [sic] the alleged victim lives.

10. That the [SBM] program in Catawba County utilizes an ankle monitoring device to detect the location of one subject to [SBM] through Global Positioning System.

11. That the ankle monitoring device is light weight, small in size, can be adjusted for comfort and is of little intrusion to the person wearing the device.

12. That the monitoring of this device is done by authorized personnel from probation and parole that are assigned to monitor a particular person subject to [SBM].

13. That there are safe guards [sic] in place to protect a person subject to [SBM] in the case of an emergency or malfunction of the equipment.

14. That there are no known circumstances regarding this defendant that would cause a unique concern about his ability to wear the ankle monitoring device whether it be physical health, mental health, the defendant's occupation, the defendant's leisure or otherwise.

15. That there does not currently exist any other way for probation and parole to utilize [SBM] other than the current practice of using an ankle bracelet.

16. That there does not exist currently any other form of monitoring available to probation and[ ]parole other than physical monitoring similar to what is understood as supervised probation and [SBM] as described above.

Based upon these findings, the trial court concluded that, under the totality of the

circumstances, the SBM program is constitutionally reasonable as applied to defendant. Defendant appealed.

Before the Court of Appeals, defendant argued: (1) the trial court exceeded its constitutional authority because the SBM order effected an unreasonable search; (2) the SBM statute is facially unconstitutional due to the State's failure to demonstrate that the program serves a legitimate government interest; and (3) orders authorizing SBM pursuant to the program constitute "general warrants" in violation of Article I, Section 20 of the North Carolina Constitution. That court issued a divided decision where it affirmed in part, reversed in part, and remanded to the trial court. *State v. Hilton*, 271 N.C. App. 505, 514, 845 S.E.2d 81, 88 (2020). The Court of Appeals noted that under *Grady I* the constitutionality of an SBM order depends on whether it is reasonable "based on the 'totality of the circumstances.' " *Id.* at 509, 845 S.E.2d at 85 (quoting *Grady I*, 575 U.S. at 310, 135 S. Ct. at 1371). It also recognized that a reviewing court should "consider, among other things, 'the nature and purpose of the search' and 'the extent to which the search intrudes upon reasonable expectations of privacy.' " *Id.* (quoting *Grady I*, 575 U.S. at 310, 135 S. Ct. at 1371).

The Court of Appeals then considered this Court's holding in *Grady III* and opined:

> Though the holding was limited to a subset of unsupervised, convicted sex offenders, the *Grady* [*III*] holding appears to impose a high standard on the State to meet in order to show reasonableness when imposing SBM

on *any* convicted sex offender who is not under any form of State supervision, mainly because of the high burden of showing the efficacy of SBM in helping solve future crimes.

In its analysis, though, our Supreme Court recognized that the calculus of reasonableness is different when a defendant *is* subject to State supervision. For instance, in the Conclusion section, the Court emphasized that its holding does not enjoin all of the SBM program's applications, in part, "because this provision *is still enforceable* against a [sex offender] during the period of his or her State supervision[.]"

*Id.* (second and third alterations in original) (citations omitted) (quoting *Grady III*, 372 N.C. at 546, 831 S.E.2d at 570). As such, the Court of Appeals held that based on *Grady III*, "the trial court's imposition of SBM on [d]efendant *for any period beyond* his period of post-release supervision is unreasonable." *Id.* at 510, 845 S.E.2d at 85.

The Court of Appeals, however, then noted that "the expectation of privacy for a defendant who is still under a form of State supervision is extremely low." *Id.* at 510, 845 S.E.2d at 86 (citing *Grady III*, 372 N.C. at 533, 831 S.E.2d at 561). According to that court, "[w]hile the intrusion [upon defendant's reasonable expectation of privacy] is great, . . . it is not as great as in *Grady* [*III*]" because "the imposition [here] is only for the remainder of the period that [d]efendant is subject to supervision." *Id.* at 511, 845 S.E.2d at 86. It also recognized that "there is a justification for SBM during [d]efendant's post-release supervision period" in that it "help[s] law enforcement determine whether [d]efendant is violating the condition of his post-release supervision that he remain in Catawba County." *Id.* The Court of Appeals

thus held that "the imposition of SBM *during* [d]efendant's post-release supervision period is reasonable." *Id.* at 510, 845 S.E.2d at 85.

¶ 10        Regarding defendant's facial challenge to the SBM statute, the Court of Appeals noted that "[t]he General Assembly's enactments are presumed to be constitutional." *Id.* at 513, 845 S.E.2d at 88. In recognizing that the State's interest in the SBM statute is "without question legitimate," *id.* (quoting *Grady III*, 372 N.C. at 543, 831 S.E.2d at 568), the Court of Appeals held that the SBM statute "is facially valid, at least to the extent that it can be applied to defendants under State supervision," *id.* Finally, the Court of Appeals addressed defendant's general warrant argument and concluded that "the imposition of SBM on individuals who are otherwise under State post-release supervision does not violate our Constitution." *Id.* at 514, 845 S.E.2d at 88. As such, the Court of Appeals affirmed the SBM order "to the extent that it imposes SBM on [d]efendant for the remainder of his post-release supervision," reversed the SBM order "to the extent that [it] imposes SBM *beyond* [d]efendant's period of post-release supervision," and remanded for further proceedings. *Id.*

¶ 11        The dissent agreed with the Court of Appeals' decision to reverse the SBM order to the extent that it imposed SBM beyond defendant's post-release supervision period. *Id.* (Brook, J., concurring in the result in part and dissenting in part). The dissent, however, would have reversed the entire SBM order because "the State

introduced no evidence of the SBM program's efficacy." *Id.* at 527, 845 S.E.2d at 96.

According to the dissent,

> the trial court made no findings of fact regarding the efficacy of the program in preventing or solving sex crimes. Nor did the State present any witnesses to testify that SBM is an effective law enforcement tool. As in *Grady III*, the State here presented no data or empirical studies to show that SBM is effective at preventing recidivism or deterring sex crimes. Nor did it request that the trial court take judicial notice of any studies or reports regarding the efficacy of SBM in reducing recidivism. The State also put forth no evidence regarding general recidivism rates of sex offenders to support the reasonableness of the intrusion.

*Id.* at 527, 845 S.E.2d at 95–96. The dissent noted that the State's "evidence of the likelihood of SBM to prevent [d]efendant's own recidivism . . . does not provide the requisite evidence *'regarding the actual efficacy of* [*the State's*] *SBM program in preventing recidivism.'* " *Id.* at 527–28, 845 S.E.2d at 96 (third alteration in original) (quoting *State v. Anthony*, 267 N.C. App. 45, 48, 831 S.E.2d 905, 907 (2019)). The dissent further opined that the State's "interest in preventing defendants from absconding" is insufficient to justify imposing SBM. *Id.* at 529, 845 S.E.2d at 97. As such, the dissent would have held "that the absence of evidence supporting SBM's efficacy in this instance means that the State cannot justify this significant lifetime intrusion on [d]efendant's privacy interests." *Id.* at 519, 845 S.E.2d at 91.

¶ 12        Defendant appealed to this Court based upon the dissenting opinion at the Court of Appeals. Additionally, this Court allowed (1) defendant's petition for

discretionary review to address whether orders authorizing SBM are unconstitutional "general warrants" prohibited by Article I, Section 20 of the North Carolina Constitution and (2) the State's petition for discretionary review to address whether the trial court properly determined that defendant was subject to lifetime SBM. We disagree with defendant's contention that the SBM order effects an unreasonable search. Rather, we hold that a search effected by the imposition of lifetime SBM upon a defendant due to his status as an aggravated offender is reasonable under the Fourth Amendment. We also hold that the SBM program does not violate Article I, Section 20 because SBM orders do not constitute "general warrants."

## II.   Reasonableness Under the Fourth Amendment

We first address whether North Carolina's SBM statute violates the Fourth Amendment by authorizing the imposition of lifetime SBM upon aggravated offenders. Enactments of the General Assembly are presumed to be constitutional. *Grady III*, 372 N.C. at 521–22, 831 S.E.2d at 553; *see San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 60, 93 S. Ct. 1278, 1311 (1973) (recognizing "the basic presumption of the constitutional validity of a duly enacted state or federal law" as "one of the first principles of constitutional adjudication"). As such, "we will not declare a law invalid unless we determine that it is unconstitutional beyond reasonable doubt." *Grady III*, 372 N.C. at 522, 831 S.E.2d at 553 (alteration omitted)

(quoting *Cooper v. Berger*, 370 N.C. 392, 413, 809 S.E.2d 98, 111 (2018)).

¶ 14        The Supreme Court has held that the imposition of SBM pursuant to North Carolina's SBM program effects a Fourth Amendment search. *Grady I*, 575 U.S. at 310, 135 S. Ct. at 1371. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by the government. U.S. Const. amend. IV.

> The Fourth Amendment prohibits only *unreasonable* searches. The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations. *See, e.g.*, *Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006) (suspicionless search of parolee was reasonable); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995) (random drug testing of student athletes was reasonable).

*Grady I,* 575 U.S. at 310, 135 S. Ct. at 1371. "[W]e 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." *Samson*, 547 U.S. at 848, 126 S. Ct. at 2197 (second alteration in original) (quoting *United States v. Knights*, 534 U.S. 112, 118, 122 S. Ct. 587, 591 (2001)). This examination must consider the government's purpose in conducting the search and the nature of the search balanced with the degree of intrusion upon the recognized privacy interest. *See Grady I*, 575 U.S. at 310, 135 S. Ct. at 1371; *Grady III*, 372 N.C. at 538, 831 S.E.2d at 564 ("The balancing analysis that we are called upon to conduct here requires us to weigh the extent of the

intrusion upon legitimate Fourth Amendment interests against the extent to which the SBM program sufficiently 'promot[es] . . . legitimate governmental interests' to justify the search, thus rendering it reasonable under the Fourth Amendment." (alterations in original) (quoting *Vernonia*, 515 U.S. at 653, 115 S. Ct. at 2390)). In assessing reasonable expectations of privacy, "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.' What expectations are legitimate varies, of course, with context." *Vernonia*, 515 U.S. at 654, 115 S. Ct. at 2391 (citing and quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 337–38, 105 S. Ct. 733, 740–41 (1985)).

¶ 15        By citing *Samson* and *Vernonia* in *Grady I*, the Supreme Court provided an instructive framework for conducting the reasonableness balancing test to determine whether imposing SBM on a limited category of convicted sex offenders is valid. *See Samson*, 547 U.S. at 848, 126 S. Ct. at 2197; *Vernonia*, 515 U.S. at 652–53, 115 S. Ct. at 2390. In *Samson* the Supreme Court evaluated the reasonableness of a statute that required parolees to agree to any warrantless search, without cause, at any time. *Samson*, 547 U.S. at 846, 852–53 n.3, 126 S. Ct. at 2196, 2199–200 n.3. The Court began "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 848, 126 S. Ct. at 2197 (quoting *Knights*, 534 U.S. at 118–19, 122 S. Ct. at 591). The Court first concluded

that parolees "have severely diminished expectations of privacy by virtue of their status alone." *Id.* at 852, 126 S. Ct. at 2199. Viewing that diminished privacy expectation in the totality of the circumstances, the Supreme Court concluded the warrantless search did not intrude upon "an expectation of privacy that society would recognize as legitimate," despite the unlimited breadth of the right to search and regardless of the crime. *Id.* Therefore, balancing no intrusion upon any reasonable expectation of privacy against the State's substantial interests in deterring recidivism, the Court found the statute constitutional under the Fourth Amendment. *Id.* at 853, 857, 126 S. Ct. at 2200, 2202.

¶ 16    In *Vernonia* the Supreme Court applied the same balancing test for another categorical warrantless search "when special needs, beyond the normal need for law enforcement, ma[d]e the warrant . . . requirement impracticable." *Vernonia*, 515 U.S. at 653, 115 S. Ct. at 2391 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S. Ct. 3164, 3168 (1987)). A school policy required that high school athletes consent to random drug screenings in order to participate in school athletics. *Id.* at 650, 115 S. Ct. at 2389. The Court noted that the school had a special relationship with the students and that "[p]ublic school locker rooms [where the drug screenings take place] . . . are not notable for the [bodily] privacy they afford." *Id.* at 655–57, 115 S. Ct. at 2391–93. As such, the Court determined that student athletes based on their status have diminished expectations of privacy. *Id.* at 657, 115 S. Ct. at 2392–93.

Next, the Court examined the intrusion upon privacy by the drug screening process and determined it had a "negligible" effect on a student athlete's privacy interests. *Id.* at 658, 115 S. Ct. at 2393. The Court then noted that "a drug problem largely fueled by the 'role model' effect of athletes' drug use, and of particular danger to athletes, is effectively addressed by making sure that athletes do not use drugs." *Id.* at 663, 115 S. Ct. at 2395–96. Therefore, the State's important interest in deterring drug use among all teenagers, particularly for the narrow, at-risk category of student athletes, justified the search under a Fourth Amendment reasonableness analysis. *Id.* at 661–62, 665, 115 S. Ct. at 2395, 2397.

¶ 17        In *Grady III* the trial court imposed SBM on the defendant solely due to his status as a recidivist even though he had completed his prison sentence and was no longer subject to post-release supervision at the time of the SBM order. *Grady III*, 372 N.C. at 516, 522, 831 S.E.2d at 550, 553. In applying the Supreme Court's *Grady I* order on remand, this Court conducted the Fourth Amendment reasonableness analysis with respect to the category in which the defendant fell—i.e., recidivists no longer subject to post-release supervision. *Id.* at 522, 831 S.E.2d at 553. This Court held the SBM program to be unconstitutional as applied to the narrow category of individuals "who are subject to mandatory lifetime SBM based solely on their status as a statutorily defined 'recidivist' who have completed their prison sentences and are no longer supervised by the State through probation, parole, or post-release

supervision." *Id.* (footnote omitted).

¶ 18     Our *Grady III* holding specifically left unanswered the question of whether the SBM program is constitutional as applied to defendants who fall outside of the narrow category of recidivists who are no longer under State supervision. *See id.* ("We decline to address the application of SBM beyond [the specified] class of individuals."). As such, we must now use the framework provided by the Supreme Court to determine the reasonableness of the General Assembly's decision to impose SBM on the category of convicted sex offenders whose convictions arose from defined aggravated offenses.

¶ 19     The first step of our reasonableness inquiry under the totality of the circumstances requires analyzing the legitimacy of the State's interest. Though the General Assembly has the authority to impose harsher prison sentences or lengthier parole times for convicted sex offenders, it chose to use an alternative civil remedy. Specifically, it enacted the SBM program as a civil, regulatory scheme to further its paramount interest in protecting the public—especially children—by monitoring certain sex offenders after their release. The General Assembly has "recognize[d] that sex offenders often pose a high risk of engaging in sex offenses even after being released from incarceration or commitment and that protection of the public from sex offenders is of paramount governmental interest." N.C.G.S. § 14-208.5 (2019).[3] "The

_____

[3] In *Grady III*, we recognized that "N.C.G.S. § 14-208.5 is relevant to . . . the 'nature and immediacy of' the State's concern in protecting the public from sex offenders." *Grady III*, 372 N.C. at 542, 831 S.E.2d at 567 (quoting *Vernonia*, 515 U.S. at 660, 115 S. Ct. at 2394).

General Assembly also recognize[d] . . . that the protection of [sexually abused] children is of great governmental interest." *Id.* These findings are supported by Supreme Court precedent, congressional action, the public policy of the various states, and "the moral instincts of a decent people." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017); *see* 34 U.S.C. § 20981 (authorizing grants to states that implement twenty-four-hour, continuous GPS monitoring programs for sex offenders); *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 4, 123 S. Ct. 1160, 1163 (2003); *Smith v. Doe*, 538 U.S. 84, 89–90, 123 S. Ct. 1140, 1145 (2003).[4]

This Court's precedent also supports the General Assembly's findings regarding the dangers posed by the recidivist tendencies of sex offenders. Specifically, in *Bryant*, we stated that "[c]onvicted sex offenders ' "are a serious threat in this Nation. [T]he victims of sex assault are most often juveniles," and "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." ' " *State v. Bryant*, 359

---

[4] When presented with conflicting evidence supporting the legislature's public policy determinations, courts should defer to the legislature's findings of fact, especially where, like here, that determination is corroborated. *See Standley v. Town of Woodfin*, 362 N.C. 328, 333, 661 S.E.2d 728, 731 (2008) (deferring to the General Assembly's finding "that sex offenders often pose a high risk of engaging in sex offenses even after being released from incarceration," N.C.G.S. § 14-208.5, and concluding that a town's concern in protecting children and others from convicted sex offenders was thus "founded on fact"); *Redevelopment Comm'n of Greensboro v. Sec. Nat'l Bank of Greensboro*, 252 N.C. 595, 611, 114 S.E.2d 688, 700 (1960) (stating that legislative findings "are entitled to weight in construing [a] statute and in determining whether the statute promotes a public purpose or use under the Constitution").

N.C. 554, 555, 614 S.E.2d 479, 480 (2005) (second and third alterations in original) (quoting *Conn. Dep't of Pub. Safety*, 538 U.S. at 4, 123 S. Ct. at 1163 (quoting *McKune v. Lile*, 536 U.S. 24, 32–33, 122 S. Ct. 2017, 2024 (2002))). We later noted in *Standley* that "released sex offenders are four times more likely to be rearrested for subsequent sex crimes than other released offenders." *Standley v. Town of Woodfin*, 362 N.C. 328, 333, 661 S.E.2d 728, 731 (2008) (citing Patrick A. Langan, et al., U.S. Dep't of Just., *Recidivism of Sex Offenders Released from Prison in 1994*, at 1 (2003)).

¶ 21      Given the dangers posed by convicted sex offenders, we have recognized that "[p]rotecting children and other[s] . . . from sexual attacks is certainly a legitimate government interest." *Id.* Most recently, we opined in *Grady III* that the State's "interests [in protecting the public through SBM] are without question legitimate." *Grady III*, 372 N.C. at 543, 831 S.E.2d at 568. There, however, our analysis applied only to the recidivist category. *Id.* at 522, 831 S.E.2d at 553. Notably, we made the following observation regarding the recidivist category:

> [l]ifetime monitoring for recidivists is mandated by our statute for anyone who is convicted of two sex offenses that carry a registration requirement. A wide range of different offenses are swept into this category. For example, a court is required to impose lifetime SBM on an offender who twice attempts to solicit a teen under the age of sixteen in an online chat room to meet with him, regardless of whether the person solicited was actually a teen or an undercover officer, or whether any meeting ever happened.

*Id.* at 544, 831 S.E.2d at 568. Unlike the recidivist category, the aggravated offender

category applies only to a small subset of individuals who have committed the most

heinous sex crimes. An individual can only receive aggravated offender status if he

> (i) engag[es] in a sexual act involving vaginal, anal, or oral
> penetration with a victim of any age through the use of
> force or the threat of serious violence; or (ii) engag[es] in a
> sexual act involving vaginal, anal, or oral penetration with
> a victim who is less than [twelve] years old.

N.C.G.S. § 14-208.6(1a) (2019). When compared to the *Grady III* example of a

recidivist with two convictions of attempted solicitation of a child by a computer, *see*

*id.* § 14-202.3(a) (2019), it is clear that those who have committed statutorily defined

aggravated offenses pose a much greater threat to society. As such, the State's

interest in protecting the public from aggravated offenders is paramount.

Further, the General Assembly has clearly stated the purpose of North

Carolina's "Sex Offender and Public Protection Registration Programs" is to

proactively protect children and others from dangerous sex offenders:

> [T]he General Assembly recognizes that law enforcement
> officers' efforts to protect communities, conduct
> investigations, and quickly apprehend offenders who
> commit sex offenses or certain offenses against minors are
> impaired by the lack of information available to law
> enforcement agencies about convicted offenders who live
> within the agency's jurisdiction. . . .
>
> Therefore, it is the purpose of this Article to assist
> law enforcement agencies' efforts to protect communities
> by requiring persons who are convicted of sex offenses or of
> certain other offenses committed against minors to register
> with law enforcement agencies, to require the exchange of
> relevant information about those offenders among law

enforcement agencies, and to authorize the access to necessary and relevant information about those offenders to others as provided in this Article.

*Id.* § 14-208.5.

¶ 23          In furtherance of this purpose, the SBM program "uses a continuous [SBM] system" for narrowly defined categories of sex offenders who present a significant enough threat of reoffending to "require[ ] the highest possible level of supervision and monitoring." *Id.* § 14-208.40(a) (2019). Under the statute, after our decision in *Grady III*,[5] the three categories of offenders who require continuous lifetime SBM to protect public safety are (1) sexually violent predators, (2) aggravated offenders, and (3) adults convicted of statutory rape or a sex offense with a victim under the age of thirteen (adult-child offenders). *Id.* § 14-208.40A(c) (2019). A "sexually violent predator" is a person who "has been convicted of a sexually violent offense," such as rape or incest, and "who suffers from a mental abnormality or personality disorder," as determined by a board of experts, "that makes the person likely to engage in sexually violent offenses directed at strangers or at a person with whom a

---

[5] *Grady III* held lifetime SBM is unconstitutional as applied to defendants "who are subject to mandatory lifetime SBM based solely on their status as a statutorily defined 'recidivist' who have completed their prison sentences and are no longer supervised by the State through probation, parole, or post-release supervision." *Grady III*, 372 N.C. at 522, 831 S.E.2d at 553 (footnote omitted). We explicitly "decline[d] to address the application of SBM beyond this class of individuals" in *Grady III. Id.* As such, our analysis in that case has no bearing on cases where lifetime SBM is imposed on sexually violent offenders, aggravated offenders, or adult-child offenders.

relationship has been established or promoted for the primary purpose of victimization." *Id.* §§ 14-208.6(5)–(6), -208.20 (2019). The second category comprises those who commit "aggravated offenses" defined as "engaging in a sexual act involving vaginal, anal, or oral penetration" either (1) through use or threat of force or (2) "with a victim who is less than [twelve] years old." *Id.* § 14-208.6(1a). Here the trial court properly found that defendant falls within this aggravated offender category. The third category includes convictions of any sex act by a person over eighteen years old against any victim under thirteen years old. *Id.* §§ 14-27.23, -27.28 (2019). If a trial court finds that an offender falls into one of these categories, the statute requires the court to "order the offender to enroll in a[n] [SBM] program for life." *Id.* § 14-208.40A(c).

¶ 24        Though the program is commonly referred to as "lifetime" monitoring, one year after a defendant completes his sentence, probation, or parole, the defendant may petition the Post-Release Supervision and Parole Commission for termination of enrollment. *Id.* §§ 14-208.41(a), -208.43 (2019). Further, the SBM program is a "civil, regulatory scheme." *State v. Bowditch*, 364 N.C. 335, 352, 700 S.E.2d 1, 13 (2010). As such, a defendant subject to SBM may petition "the court . . . [to] relieve [him] from a final . . . [SBM] order . . . for . . . [a]ny . . . reason justifying relief from the operation

of the [order]." N.C.G.S. § 1A-1, Rule 60(b)(6) (2019).[6]

Imposing lifetime SBM upon aggravated offenders serves the General Assembly's stated purpose by assisting law enforcement agencies in solving crimes. For instance,

> [p]assive GPS data may place a sex offender at the scene of a crime, allowing an agency to identify potential suspects or witnesses. A sex offender's alibi may be supported or discredited using GPS data. This information could assist law enforcement agencies with verifying sex offender registration information, such as residential or employment address, and locating noncompliant sex offenders and absconders. . . .
>
> Active GPS systems can assist law enforcement agencies in enforcing exclusion and inclusion zones. If an agency receives notification that an offender has entered an exclusionary zone, a quick response may prevent an offense. If the agency finds the sex offender near a school or playground, the officer on the scene can report this information to the offender's probation or parole officer.

Int'l Ass'n of Chiefs of Police, *Tracking Sex Offenders with Electronic Monitoring Technology: Implications and Practical Uses for Law Enforcement* 4 (2008).

Further, in a case pending before this Court, *State v. Strudwick*, No. 334PA19-2, the State's witness, a probation officer, testified concerning situations in which lifetime SBM would assist law enforcement in preventing and solving future

---

[6] The General Assembly's recent amendments to the SBM statute become effective on 1 December 2021. *See* Act of Sep. 2, 2021, S.L. 2021-138, § 18.(p). These changes may provide defendant with an additional avenue of relief. *Id.* § 18.(i).

crimes. The trial court in *Strudwick* found that "when a sexual assault is reported, location information from the monitor could be used to implicate the participant as a suspect if he was in the area of the sexual assault, or to eliminate him as a suspect if he was not in the area of a sexual assault." We take judicial notice of this finding from *Strudwick*. *See State ex rel. Swain v. Creasman*, 260 N.C. 163, 164, 132 S.E.2d 304, 305 (1963) (taking judicial notice of the Court's own records). As such, we conclude that the SBM program assists law enforcement agencies in solving crimes.

SBM also serves the State's interest in protecting the public from aggravated offenders by deterring recidivism. *See Belleau v. Wall*, 811 F.3d 929, 943 (7th Cir. 2016) ("[I]t is undisputed that the [SBM] law promotes deterrence."); *accord Doe v. Bredesen,* 507 F.3d 998, 1007 (6th Cir. 2007). SBM "deter[s] future offenses by making the [subject] aware that he is being monitored and is likely therefore to be apprehended should a sex crime be reported at a time, and a location, at which he is present." *Belleau*, 811 F.3d at 935; *see also Vernonia*, 515 U.S. at 663, 115 S. Ct. at 2395–96 (remarking that the "efficacy" of the search was "self-evident" where the goal was to deter drug use by athletes and the school promulgated the drug-testing policy so that athletes would know they would be tested); *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 632, 109 S. Ct. 1402, 1421 (1989) (recognizing that drug tests "are highly effective means of . . . deterring the use of drugs"). Just as the drug-testing policy in *Vernonia* serves as an effective deterrent with respect to student athletes

categorically, the SBM program in the present case serves as an effective deterrent with respect to aggravated offenders categorically.

¶ 28    SBM's efficacy as a deterrent is supported by empirical data. The National Institute of Justice sponsored a "research project examin[ing] the impact that GPS monitoring has on the recidivism rates of sex offenders in California." Philip Bulman, *Sex Offenders Monitored by GPS Found to Commit Fewer Crimes*, 271 NIJ J. 22, 22 (Feb. 2013). The study "found that those placed on GPS monitoring had significantly lower recidivism rates than those who received traditional supervision." *Id.* In fact, offenders not placed on GPS monitoring "returned to custody at a rate 38 percent higher than [those placed on GPS monitoring]." *Id.* at 23. Similarly, a more recent study "examine[d] whether GPS is effective in terms of reducing violations for supervision conditions as well as new criminal behavior and returns to custody among" high risk sex offenders. Susan Turner, Alyssa W. Chamberlain, Jesse Jannetta & James Hess, *Does GPS Improve Recidivism among High Risk Sex Offenders? Outcomes for California's GPS Pilot for High Risk Sex Offender Parolees*, Victims & Offenders: Int'l J. Evidence-based Rsch., Pol'y, and Prac., Jan. 2015, at 7. The study found that offenders not placed on GPS monitoring "were significantly more likely to be violated for new criminal behavior compared to GPS offenders (35.2% versus 19.1%[)]." *Id.* at 15. These studies demonstrate that SBM is efficacious in reducing recidivism. Since we have recognized the efficacy of SBM in assisting with

the apprehension of offenders and in deterring recidivism, there is no need for the State to prove SBM's efficacy on an individualized basis.

¶ 29        Having found that the SBM program serves a legitimate government interest, we next consider the scope of the privacy interests involved. An aggravated offender's expectation of privacy is severely diminished while he is subject to post-release supervision. *See Samson*, 547 U.S. at 844, 126 S. Ct. at 2195 ("An inmate electing to complete his sentence out of physical custody remains in the Department of Corrections' legal custody for the remainder of his term and must comply with the terms and conditions of his parole. The extent and reach of those conditions demonstrate that parolees have severely diminished privacy expectations by virtue of their status alone."); *Grady III*, 372 N.C. at 546, 831 S.E.2d at 570 (stating that the SBM statute is "still enforceable against a recidivist during the period of his or her State supervision"). At the SBM hearing, defendant's counsel admitted that "[d]uring the time that [defendant] is out on parole . . . he has a lower expectation of privacy. He has [a] diminished expectation of privacy." Defendant's counsel thus conceded that SBM "would be appropriate" during defendant's period of parole. Therefore, SBM is clearly constitutionally reasonable during a defendant's post-release supervision period.

¶ 30        Though an aggravated offender regains some of his privacy interests upon the completion of his post-release supervision term, these interests remain impaired for

the remainder of his life due to his status as a convicted aggravated sex offender. "[I]t is beyond dispute that convicted felons do not enjoy the same measure of constitutional protections, including the expectation of privacy under the Fourth Amendment, as do citizens who have not been convicted of a felony." *Bowditch*, 364 N.C. at 349–50, 700 S.E.2d at 11 (citations omitted); *see also Vernonia*, 515 U.S. at 654, 115 S. Ct. at 2391 ("[T]he legitimacy of certain privacy expectations vis-à-vis the State may depend upon the individual's legal relationship with the State."); *Grady III*, 372 N.C. at 534, 831 S.E.2d at 561 (recognizing that "a person's status as a convicted sex offender may affect the extent to which the State can infringe upon fundamental rights"). Convicted felons face a plethora of lifetime rights restrictions including a reduction in liberty interests and Fourth Amendment privacy expectations "that society recognizes as 'legitimate.' " *Vernonia*, 515 U.S. at 654, 115 S. Ct. at 2391 (quoting *T.L.O.*, 469 U.S. at 338, 105 S. Ct. at 741). For example, their liberty interests are restricted regarding firearms possession. *Cf. District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S. Ct. 2783, 2816–17 (2008) (affirming that the "longstanding prohibitions on the possession of firearms by felons" survive Second Amendment scrutiny). Additionally, individuals convicted of sex offenses may be permanently barred from certain occupations, a harsh sanction that limits them from choosing where they work and what type of livelihood they may pursue. *E.g.*, N.C.G.S. § 84-28(b)(1), (c) (2019) (attorney); *id.* § 90-14(a)(7), (c) (2019) (medical

doctor); *id.* § 93-12(9)(a) (2019) (certified public accountant); *id.* § 93A-6(b)(2) (2019) (real estate broker).

¶ 31        Sex offender registration requirements also manifest a diminished expectation of privacy. *Cf. Smith*, 538 U.S. at 89–90, 123 S. Ct. at 1145–46. For instance, a registrant is required to provide the following information to the public: "name, sex, address, physical description, picture, conviction date, offense for which registration was required, the sentence imposed as a result of the conviction, and registration status." N.C.G.S. § 14-208.10(a) (2019). Since aggravated offenders are required to remain on the sex offender registry for life, *see* N.C.G.S. § 14-208.23 (2019), certain liberty, movement, and privacy restrictions apply even after the completion of any post-release supervision term. Specifically, aggravated offenders are perpetually inhibited by limitations on their movements and residency restrictions. *See* N.C.G.S. § 14-208.18(a)(1), (4) (2019) (prohibiting registered sex offenders from being present at "any place intended primarily for the use, care, or supervision of minors, including, but not limited to, schools, children's museums, child care centers, nurseries, and playgrounds," as well as the State Fair); *Standley*, 362 N.C. at 333, 661 S.E.2d at 732 (upholding prohibition on convicted sex offenders entering public parks); N.C.G.S. § 14-208.16(a) (2019) (prohibiting registered sex offenders from "knowingly resid[ing] within 1,000 feet of the property on which any public or nonpublic school or child care

center is located").[7] Society therefore recognizes that aggravated offenders have restricted liberty interests and diminished privacy expectations for the entirety of their lives.

¶ 32    We lastly consider the level of intrusion effected by the imposition of lifetime SBM. Unlike punitive measures, SBM "does not impose a significant affirmative disability or restraint." *Belleau*, 811 F.3d at 943. As the trial court found, "the ankle monitoring device is light weight, small in size, can be adjusted for comfort and is of little intrusion to the person wearing the device." Specifically, the device is "approximately 2-inches wide" and "is the size of an 8-ounce coke can." Charging the device takes approximately two hours per day. Further, the device does not hamper medical treatment because it can easily be removed by any medical provider in the event of an emergency. "The restraint imposed by these requirements is minimal and incidental to [SBM's] actual purpose—tracking [the offender's] whereabouts." *Id.* "[A]s GPS devices become smaller and batteries last longer, any affirmative restraint imposed by [SBM] will, over time, become less and less burdensome." *Id.* These physical limitations are more inconvenient than intrusive and do not materially

---

[7] The General Assembly recently amended N.C.G.S. § 14-208.16(a) to broaden its scope. *See* Act of Aug. 23, 2021, S.L. 2021-115, § 3, https://www.ncleg.gov/Sessions/2021/Bills/House/PDF/H84v4.pdf (prohibiting registered sex offenders from knowingly residing "within 1,000 feet of any property line of a property on which any public or nonpublic school or child care center is located" or "[w]ithin any structure, any portion of which is within 1,000 feet of any property line of a property on which any public or nonpublic school or child care center is located").

invade an aggravated offender's diminished privacy expectations.

¶ 33        Regarding the effect on other privacy interests, SBM falls on a spectrum of available "regulatory schemes that address the recidivist tendencies of convicted sex offenders." *Bowditch*, 364 N.C. at 341, 700 S.E.2d at 6. At one end of the continuum, criminal sanctions—i.e., imprisonment, probation, and parole—and civil commitment involve a highly invasive affirmative restraint and deprivation of rights. *See Kansas v. Hendricks,* 521 U.S. 346, 363, 117 S. Ct. 2072, 2083 (1997); *Belleau*, 811 F.3d at 932. Next, housing, career, and travel limitations significantly restrict the exercise of fundamental freedoms. Finally, on the other end of the spectrum, registration statutes impose the fewest restrictions on a defendant's liberty and privacy, yet they still require the offender to provide certain personal information to law enforcement and the public. *See* N.C.G.S. § 14-208.10.

¶ 34        The privacy intrusion effected by SBM falls on the less intrusive side of the regulatory spectrum. *See Belleau*, 811 F.3d at 943 (noting that SBM "imposes as little burden as possible on the offender"). Similar to sex offender registration, SBM provides information to the State that is not ordinarily required for the general public, protects the public through deterrence, and allows for termination. Specifically, under the statute, a defendant may petition to be removed from SBM after one year. N.C.G.S. § 14-208.43 (permitting termination if a defendant shows he has not been convicted of any additional qualifying convictions, has substantially

complied with the SBM program, and "is not likely to pose a threat to the safety of others"). Since the SBM program is civil in nature, the North Carolina Rules of Civil Procedure govern. As such, a defendant may also seek removal of SBM through Rule 60(b). *Id.* § 1A-1, Rule 60(b)(6) ("On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding for . . . [a]ny . . . reason justifying relief from the operation of the judgment."). These avenues for termination reduce the degree of intrusion caused by lifetime SBM.[8]

¶ 35    SBM also stands in stark contrast to the potential confinement measures that convicted sex offenders face. Unlike criminal imprisonment or civil commitment, "[t]he SBM program does not detain an offender in any significant way." *Bowditch*, 364 N.C. at 349, 700 S.E.2d at 11. Additionally, "[t]he monitoring taking place in the SBM program is far more passive and is distinguishable from the type of State supervision imposed on probationers." *Id.* at 346, 700 S.E.2d at 9. While these alternative measures limit a sex offender's liberty interests, SBM does not. For instance, SBM does not prevent a defendant from going anywhere he is otherwise allowed to go. *See Belleau*, 811 F.3d at 936 ("It's untrue that 'the GPS device burdens liberty . . . by its continuous surveillance of the offender's activities'; it just identifies locations; it doesn't reveal what the wearer of the device is doing at any of the locations." (alteration in original) (quoting *Commonwealth v. Cory*, 454 Mass. 559,

---

[8] *See* footnote 6 of this opinion.

570, 911 N.E.2d 187, 196 (2009))). Where a defendant is unsupervised, no one regularly monitors the defendant's location, significantly lessening the degree of intrusion. *See id.* at 941 (Flaum, J., concurring). "Occupational debarment is [also] far more harsh than an SBM program . . . ." *Bowditch*, 364 N.C. at 349, 700 S.E.2d at 10; *see also Bredesen,* 507 F.3d at 1005 (citing *Smith*, 538 U.S. at 100, 123 S. Ct. at 1151) (noting SBM is less harsh than occupational debarment). Therefore, SBM is significantly less intrusive than the harsher alternatives that convicted sex offenders face.[9] Given the totality of the circumstances, SBM's collection of information regarding physical location and movements effects only an incremental intrusion into an aggravated offender's diminished expectation of privacy.

¶ 36    In sum, the State's interest in protecting the public—especially children—from aggravated offenders is paramount. The SBM program furthers this interest by deterring recidivism and assisting law enforcement agencies in solving crimes. Further, an aggravated offender has a diminished expectation of privacy both during and after any period of post-release supervision as shown by the numerous lifetime restrictions that society imposes upon him. Lastly, the imposition of lifetime SBM causes only a limited intrusion into that diminished privacy expectation. Therefore,

---

[9] We in no way opine that SBM is a form of punishment. Rather, in looking at the full spectrum of potential State action, we highlight criminal imprisonment, civil commitment, probation, and occupational debarment to show that SBM is a less intrusive means of protecting the public from convicted sex offenders.

in light of the totality of the circumstances, the paramount government interest outweighs the additional intrusion upon an aggravated offender's diminished privacy interests. As such, we hold that a search effected by the imposition of lifetime SBM on the category of aggravated offenders is reasonable under the Fourth Amendment. Therefore, the SBM statute as applied to aggravated offenders is not unconstitutional.

¶ 37      Here defendant was convicted of first-degree statutory rape and first-degree statutory sexual offense. These convictions qualify defendant as an aggravated offender under N.C.G.S. § 14-208.6(1a). The trial court thus appropriately ordered lifetime SBM pursuant to N.C.G.S. § 14-208.40A(c). "The touchstone of the Fourth Amendment is reasonableness, not individualized suspicion." *Samson*, 547 U.S. at 855 n.4, 126 S. Ct. at 2201 n.4. Further, this Court's practice is to examine searches effected by the SBM statute categorically. *See Grady III*, 372 N.C. at 522, 831 S.E.2d at 553. Therefore, in light of our determination in the present case that searches effected by the imposition of lifetime SBM are reasonable as applied to the aggravated offender category, the trial court's imposition of SBM in this case does not violate the Fourth Amendment.

### III.      "General Warrant" Under Article I, Section 20

¶ 38      We next address whether the SBM program complies with Article I, Section 20

of the North Carolina Constitution.[10] "The analytical framework for reviewing a facial constitutional challenge is well-established." *Town of Boone v. State*, 369 N.C. 126, 130, 794 S.E.2d 710, 714 (2016). "Our 'State Constitution is in no matter a grant of power,' and as such, '[a]ll power which is not limited by the Constitution inheres in the people, and an act of a State legislature is legal when the Constitution contains no prohibition against it.' " *Id.* (alteration in original) (citations omitted) (quoting *Lassiter v. Northampton Cnty. Bd. of Elections*, 248 N.C. 102, 112, 102 S.E.2d 853, 861 (1958), *aff'd*, 360 U.S. 45, 79 S. Ct. 985 (1959)). "We seldom uphold facial challenges because it is the role of the legislature, rather than this Court, to balance disparate interests and find a workable compromise among them." *Id.* (quoting *Beaufort Cnty. Bd. of Educ. v. Beaufort Cnty. Bd. of Comm'rs*, 363 N.C. 500, 502, 681 S.E.2d 278, 280 (2009)). Thus, we will only declare an act of the General Assembly to be unconstitutional when "it [is] plainly and clearly the case" and "its unconstitutionality [is] demonstrated beyond reasonable doubt." *Id.* (first alteration in original) (first quoting *State ex rel. Martin v. Preston*, 325 N.C. 438, 449, 385 S.E.2d 473, 478 (1989), then citing *Baker v. Martin*, 330 N.C. 331, 334–35, 410 S.E.2d 887,

---

[10] Defendant asks this Court to "declare the SBM procedures codified in [the statute] facially unconstitutional because they authorize the issuance of orders which are indistinguishable from, and tantamount to, . . . 'general warrants.' "

889 (1991)).

¶ 39    Article I, Section 20 provides that "[g]eneral warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted."[11] N.C. Const. art. I, § 20. "Both the state and the U.S. constitutions prohibit general warrants, but only the state constitution defines them as such: warrants that are not supported by evidence and that do not name names." John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 73 (2d ed. 2013). "Drawn originally from a section of the Virginia Declaration of Rights, the ban on general warrants reflects colonial experience with abuses of the procedures of criminal investigation by the authorities." *Id.* (citing Va. Const. of 1776, Declaration of Rights § 10). "Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance[12] under which . . . . customs officials

---

[11] The language of Article I, Section 20 is nearly identical to that in North Carolina's original Constitution. *See* N.C. Const. of 1776, Declaration of Rights § XI ("That General Warrants whereby any Officer or Messenger may be commanded to search suspected Places, without Evidence of the Fact committed, or to seize any Person or Persons not named, whose offence is not particularly described and supported by Evidence, are dangerous to Liberty, and ought not to be granted.").

[12] These writs of assistance "received their name from the fact that they commanded all officers and subjects of the Crown to assist in their execution." Nelson B. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 53–54 (1937).

[had] blanket authority to search where they pleased for goods imported in violation of the British tax laws." *Stanford v. Texas*, 379 U.S. 476, 481, 85 S. Ct. 506, 510 (1965). "[T]he consistent and overarching themes in colonial judicial resistance to the writs was opposition to their *unparticularized nature* and to the *unconstrained discretion* they therefore afforded a searcher." Fabio Arcila Jr., *In the Trenches: Searches and the Misunderstood Common-Law History of Suspicion and Probable Cause*, 10 U. Pa. J. Const. L. 1, 13 (2007) (emphases added).

> Courts and commentators condemned general warrants precisely because they lacked each of the protections afforded by specific warrants: a complainant's swearing out of specific allegations, the complainant's accountability for fruitless searches, a judge's assessment of the grounds for the warrant, and—perhaps most importantly—clear directions to the officer as to whom to arrest or where to search.

Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 655–57 (1999).

¶ 40 Unlike the writs of assistance seen during the founding era, orders imposing lifetime SBM adhere to a meticulous statutory procedure. Under the SBM program, a defendant is entitled to a hearing where the State must present evidence establishing how the defendant qualifies for SBM enrollment. N.C.G.S. § 14-208.40A(a). The defendant may then present evidence to refute the State's presentation. *Id.* After hearing evidence from both parties, the trial court must make findings of fact for every category of eligibility under which the defendant qualifies.

*Id.* § 14-208.40A(b). The trial court must then order SBM depending on the defendant's statutory category, each of which requires that the defendant be a convicted sex offender. *Id.* § 14-208.40A(c). These procedural protections are significantly more robust than the protections afforded by specific warrants.

¶ 41          Further, the scope of the search effected by an SBM order is not "indiscriminate." Rather, the General Assembly has defined the limited scope of any such search:

> The [SBM] program shall use a system that provides all of the following:
>
> (1) Time-correlated and continuous tracking of the geographic location of the subject using a global positioning system based on satellite and other location tracking technology.
>
> (2) Reporting of subject's violations of prescriptive and proscriptive schedule or location requirements. Frequency of reporting may range from once a day (passive) to near real-time (active).

N.C.G.S. § 14-208.40(c). Thus, the State may only access a defendant's physical location as recorded by the satellite monitoring device. Unlike general warrants and writs of assistance, the SBM program does not authorize State officials to indiscriminately search unidentified individuals for unspecified items and for an indefinite period of time without stated cause or constraint. Orders imposing SBM pursuant to the program thus do not constitute general warrants. Defendant has

failed to demonstrate that the SBM program is unconstitutional beyond reasonable doubt. As such, we hold that the SBM order complies with Article I, Section 20.

## IV. Conclusion

¶ 42 A search arising from the SBM program for a limited category of aggravated offenders, given the totality of the circumstances, is reasonable under the Fourth Amendment. The purpose of the SBM program to protect the public from sex crimes is of paramount importance, and an aggravated offender's reasonable expectation of privacy is significantly diminished. The incremental nature of a search providing location information and the method of data collection via an ankle bracelet are more inconvenient than intrusive. Moreover, the SBM program provides a particularized procedure for imposing SBM and thus does not violate Article I, Section 20. Accordingly, we modify and affirm the portion of the Court of Appeals' decision which upheld the imposition of SBM during post-release supervision and reverse the portion of the decision which held the imposition of post-supervision SBM to be an unreasonable search. Therefore, we reinstate the trial court's SBM order.

MODIFIED AND AFFIRMED IN PART, REVERSED IN PART.

Justice EARLS dissenting.

¶ 43     The majority addresses a version of the satellite-based monitoring (SBM) statutes which, as of 2 September 2021, have been amended in ways that likely obviate at least some of the constitutional issues which form the basis of Mr. Hilton's appeal. *See* Act of Sept. 2, 2021, S.L. 2021-138, § 18, https://www.ncleg.gov/Sessions/2021/Bills/Senate/PDF/S300v8.pdf. Although the majority acknowledges that the new law applies to Mr. Hilton, the majority fails to account for the fact that operation of its newly enacted provisions will afford Mr. Hilton the opportunity to have the order requiring him to enroll in SBM for life converted into an order requiring him to enroll in SBM for ten years. A decision which fails to examine the consequences of S.L. 2021-138 ignores the actual manner in which SBM will be applied to Mr. Hilton and thus has no relevance to future decisions interpreting the statutes governing the SBM program.

¶ 44     The proper course for a Court to follow when the General Assembly amends a statute while litigation involving the constitutionality of that statute is pending is, at a minimum, to permit further briefing on the impact of the amendments. Further briefing is necessary because when a statute is amended

> it is presumed that the legislature intended either (a) to change the substance of the original act, or (b) to clarify the meaning of it. 82 C.J.S. Statutes § 384, p. 897 (1953). The presumption is that the legislature "intended to change the original act by creating a new right or withdrawing any

> existing one." 1 Sutherland, Statutory Construction § 1930
> (Horack, 3d ed. 1943).

*Childers v. Parker's, Inc.,* 274 N.C. 256, 260 (1968). As the majority acknowledges, the new statutes provide Mr. Hilton with a new remedy. Thus, the opinion rendered by the Court today is only relevant for the few weeks remaining until the new law takes effect. Absent any exigent or urgent circumstances attendant to the parties in this case, the Court acts rashly, and without any apparent rationale or justification, in issuing an unnecessary opinion about a law the General Assembly has seen fit to change.

Even on its own terms, the majority's soon-to-be-irrelevant conclusion that imposing lifetime SBM on Mr. Hilton is constitutional, based solely upon his status as having been convicted of an aggravated offense as defined under N.C.G.S. § 14-208.6(1a), without an assessment of his individual circumstances, and absent any evidence in the record indicating that lifetime SBM serves the State's asserted interest, is patently incorrect. The majority reaches this conclusion only by flouting or mischaracterizing precedents from this Court and the United States Supreme Court and by disregarding the Fourth Amendment. Therefore, I dissent.

**I. Although Mr. Hilton is currently subject to an order requiring him to enroll in lifetime SBM, he will not be required to enroll in SBM for more than ten years.**

In *Grady III*, this Court held unconstitutional the imposition of lifetime SBM as applied to "individuals who are subject to mandatory lifetime SBM based solely

upon their status as a statutorily defined 'recidivist' who have completed their prison sentences and are no longer supervised by the State through probation, parole, or post-release supervision." *State v. Grady (Grady III)*, 372 N.C. 509, 522 (2019) (footnote omitted). Although we "decline[d] to address the application of SBM beyond this class of individuals," *id.*, our examination of the Fourth Amendment and the contours of the SBM program plainly had implications for any individual subject to lifetime SBM pursuant to N.C.G.S. § 14-208.40. Every panel of the Court of Appeals confronted with a challenge to a lifetime SBM order—including challenges raised by individuals who fell outside the category of offenders addressed in *Grady III*—turned to *Grady III* for guidance. *See, e.g., State v. Gordon*, 270 N.C. App. 468, 469 (2020), *review allowed, writ allowed*, 853 S.E.2d 148 (N.C. 2021); *State v. Jackson*, No. COA18-1122, 2020 WL 2847885, at *15–18 (N.C. Ct. App. June 2, 2020) (unpublished), *review denied*, 375 N.C. 494 (2020); *State v. Hutchens*, 272 N.C. App. 156, 160–61 (2020).[1] The same Fourth Amendment and the same statutes obviously apply to any individual subject to SBM, whether he or she is an aggravated offender or a recidivist.

¶ 47  The General Assembly also recognized that *Grady III* cast doubt on the constitutionality of N.C.G.S. § 14-208.40 as applied to all categories of offenders

---

[1] A longer list of Court of Appeals decisions interpreting and applying *Grady III* to resolve the merits of an individual's challenge to an SBM order can be found in Appendix I.

automatically made subject to lifetime SBM, not just recidivists. S.L. 2021-138, an omnibus criminal justice reform bill, is titled in relevant part "AN ACT TO . . . ADDRESS CONSTITUTIONAL ISSUES WITH SATELLITE-BASED MONITORING RAISED IN STATE VERSUS GRADY AND CREATE A PROCESS TO REVIEW WHETHER OFFENDERS SUBJECT TO THAT CASE WHICH WERE REMOVED FROM SATELLITE-BASED MONITORING ARE OTHERWISE ELIGIBLE."[2] The final version of S.L. 2021-138 which contains the provisions amending the SBM program was ratified by the Legislature on 25 August 2021—after oral argument was heard in this case—and signed by the Governor on 2 September 2021. The Act becomes effective on 1 December 2021.

¶ 48    S.L. 2021-138 made changes to the SBM program which will be applicable to all individuals ordered to enroll in SBM on the basis of their status as among one of the categories of offenders singled out by N.C.G.S. § 14-208.40(a), including aggravated offenders similarly situated to Mr. Hilton, after the law becomes effective. Many of these changes directly respond to constitutional concerns identified by this Court in *Grady III*. Together, they render much of the majority's reasoning unnecessary dicta.

---

[2] As we have noted, "even when the language of a statute is plain, 'the title of an act should be considered in ascertaining the intent of the legislature.' *Smith Chapel Baptist Church v. City of Durham,* 350 N.C. 805, 812, 517 S.E.2d 874, 879 (1999) (*citing State ex rel. Cobey v. Simpson*, 333 N.C. 81, 90, 423 S.E.2d 759, 764 (1992))." *Ray v. N.C. DOT,* 366 N.C. 1, 8 (2012).

¶ 49     First, the Act adds a new section, N.C.G.S. § 14-208.39, which for the first time provides some evidentiary basis for the State's assertion that SBM effectively deters individuals convicted of sex offenses from committing further sex crimes. *Id.* at § 18.(a). Second, the Act amends N.C.G.S. § 14-208.40(a)(1) to impose SBM only upon certain categories of offenders, including aggravated offenders and recidivists[3], who "based on the Division of Adult Correction and Juvenile Justice's risk assessment program require[ ] the highest possible level of supervision and monitoring." *Id.* at § 18.(c). Third, the Act amends N.C.G.S. § 14-208.40A to establish that an offender eligible for SBM pursuant to N.C.G.S. § 14-208.40(a)(1) shall be ordered to enroll in SBM for a period of ten years, rather than for life. *Id.* at § 18.(d).

¶ 50     Each of these changes significantly alters the legal terrain upon which the constitutionality of SBM as applied to individuals subject to SBM due to their status as aggravated offenders will be assessed going forward. Because the majority opinion addresses a version of the SBM program yet to incorporate these changes, our decision today has no relevance to the disposition of future legal challenges brought by any individual after S.L. 2021-138 takes effect on 1 December 2021.

¶ 51     However, because the majority's opinion also ignores changes the General Assembly made to the SBM program which directly and unmistakably apply to

---

[3] S.L. 2021-138 uses the term "reoffender" instead of "recidivist." For ease of reading, I continue to use the term "recidivist" throughout.

individuals ordered to enroll in lifetime SBM prior to the enactment of S.L. 2021-138, the majority opinion has little relevance as applied to Mr. Hilton, either.

¶ 52      S.L. 2021-138 adds a new section to Article 27A which provides that an offender like Mr. Hilton who is "enrolled in a satellite-based monitoring [program] for life may file a petition for termination or modification of the monitoring requirement with the superior court in the county where the conviction occurred five years after the date of initial enrollment." Act of Sept. 2, S.L. 2021-138, § 18.(i) (to be codified at N.C.G.S. § 14-208.46(a)). Only two outcomes can result when an individual files such a petition. For individuals who have been enrolled in SBM for less than ten years, "the court shall order the petitioner to remain enrolled in the satellite-based monitoring program for a total of 10 years." *Id.* (to be codified at N.C.G.S. § 14-208.46(d)). For individuals who have been enrolled in SBM for more than ten years, "the court shall order the petitioner's requirement to enroll in the satellite-based monitoring program be terminated." *Id.* (to be codified at N.C.G.S. § 14-208.46(e)). Thus, upon motion of any individual subject to an order requiring lifetime enrollment in SBM, the order requiring lifetime enrollment in SBM will be converted into an order requiring enrollment in SBM for a period of time not to exceed ten years.

¶ 53      Shortening the period of time an individual is required to enroll in SBM from life to ten years significantly diminishes the burden SBM places on an individual's constitutional privacy interests. It reduces the likelihood that an individual will be

required to enroll in SBM for an extended period of time beyond his or her period of incarceration and post-release supervision. It also reduces the risk that technological advancements—or changes in an individual's circumstances—will render the considerations justifying the initial imposition of SBM obsolete. The period of time Mr. Hilton would be subject to SBM was undoubtedly relevant to the Court of Appeals' disposition of his appeal, which correctly distinguished between the period of time during which Mr. Hilton was under post-release supervision and the remainder of his life after completing the terms of his sentence. *State v. Hilton*, 271 N.C. App. 505, 512–13 (2020) ("After [his] period of supervision, the imposition of SBM is no longer reasonable, as [Mr. Hilton's] expectation of privacy is too high and the State's legitimate purpose in monitoring [his] location . . . is extinguished."). At a minimum, this Court should consider the changes implemented by S.L. 2021-138 before resolving Mr. Hilton's constitutional claims.

¶ 54 Consistent with the text, purpose, and structure of S.L. 2021-138, Mr. Hilton will be entitled to avail himself of the new procedural mechanism created by subsection 18.(i) of the Act. Subsection 18.(p) provides that "[s]ubsection (i) of this section becomes effective December 1, 2021, and applies to any individual required to enroll in satellite-based monitoring for life on or after that date." As the statutes governing the SBM program make readily apparent, individuals like Mr. Hilton who were initially ordered to enroll in lifetime SBM prior to 1 December 2021 will be

"required to enroll" in SBM on 1 December 2021, 2 December 2021, and on every day

afterwards unless and until the initial order is modified or terminated.

> [W]hen an offender is required to enroll in satellite-based monitoring . . . the offender shall continue to be enrolled in the satellite-based monitoring program for the period required [ ] *unless the requirement that the person enroll in a satellite-based monitoring program is terminated. . . .* The offender shall cooperate with the Division of Adult Correction and Juvenile Justice and the requirements of the satellite-based monitoring program *until the offender's requirement to enroll is terminated*[.]"

N.C.G.S. § 14-208.42 (2019) (emphases added). Further, if individuals like Mr. Hilton

are not entitled to utilize the procedural mechanism created by subsection 18.(i) of

the Act, then nobody is. Subsection 18.(i) provides that "[a]n offender who is enrolled

in a satellite-based monitoring for life may file a petition for termination or

modification of the monitoring requirement . . . ." *Id.* at § 18.(i). However, after 1

December 2021, every court entering an SBM order must comply with the statutory

changes enacted by subsection 18.(d), which amends N.C.G.S. § 14-208.40A to require

a court to "order the offender to enroll in a [SBM] program for a period of 10 years."

*Id.* at § 18.(d). To respect the legislature's policy choice to afford offenders required to

enroll in lifetime SBM a process through which those orders will be modified or

terminated, individuals like Mr. Hilton who were previously ordered to enroll in

lifetime SBM must be able to utilize the procedural mechanism subsection 18.(i)

creates.[4]

¶ 55        The practical effect of S.L. 2021-138 is that no individual in North Carolina, no matter when they were initially ordered to participate in SBM, will be required to enroll in the program for life if they avail themselves of the process established by statute. Thus, the majority's sweeping holding that "a search effected by the imposition of lifetime SBM upon a defendant due to his status as an aggravated offender is reasonable under the Fourth Amendment" does not address the circumstances of this case, or of any case that is likely to arise under North Carolina law. We lack authority and reason to construe a statute the legislature has chosen to amend. *Cf. State v. McCluney,* 280 N.C. 404, 407 (1972) (holding that "repeal of [the challenged statute] renders moot the question of its constitutionality"). Given the changes enacted by S.L. 2021-138, the majority opinion does no more than express the speculative view of four Justices that it would not offend the Fourth Amendment to require an individual to enroll in SBM for life based solely upon his or her status

---

[4] The final report summarizing S.B. 300 (now S.L. 2021-138) released by the General Assembly's Legislative Analysis Division stated that the provisions amending the SBM program "to address constitutional issues" would "[r]educe lifetime SBM to ten years" and "[a]llow for a judicial review to terminate or modify SBM for offenders." Legislative Analysis Division, 2021–22 N.C. Gen. Assemb., Bill Summary (Aug. 18, 2021), https://dashboard.ncleg.gov/api/Services/BillSummary/2021/S300-SMSA-67(e6)-v-2. Although not determinative, this "contemporaneous committee report[ ]" sheds further light on the "purpose of this specific part" of the broader Act, *Est. of Savino v. Charlotte-Mecklenburg Hosp. Auth.*, 375 N.C. 288, 296 (2020), which is to ensure that no individual in North Carolina is required to enroll in SBM for life given the significant constitutional issues such a requirement creates.

as an aggravated offender. Under our precedents, that is not a function this Court is empowered to perform.

## II. The Fourth Amendment does not permit the State to impose lifetime SBM solely on the basis of an individual's status as an aggravated offender.

¶ 56 For the reasons stated above, I do not believe it is necessary for the majority to opine on the constitutionality of subjecting Mr. Hilton to lifetime SBM when S.L. 2021-138 will afford him the opportunity to seek and obtain an order reducing his required period of enrollment from life to ten years. However, because the majority chooses to reach this question, I also write to explain why its choice to reverse the decision of the Court of Appeals and leave the trial court's SBM order undisturbed cannot be reconciled with the Fourth Amendment or with the precedent we established in *Grady III*.

## A. SBM is a "civil, regulatory scheme," not a lesser "punishment."

¶ 57 First, the majority justifies the imposition of lifetime SBM on Mr. Hilton as a lesser punishment than imprisonment. The implication is that because the alternative to an order imposing SBM is criminal imprisonment or civil commitment, the intrusion on Mr. Hilton's privacy rights is minimal. Yet the order imposing SBM on Mr. Hilton is not restricted to Mr. Hilton's period of incarceration and post-release supervision—the order imposes SBM *for life*, including any time remaining after he

has completed all of the terms of his sentence.[5] The majority's sweeping logic simply does not hold true under circumstances contemplated in the order itself.

¶ 58      More fundamentally, this Court held in *State v. Bowditch*, 364 N.C. 335 (2010), that North Carolina's SBM program is a "civil, regulatory scheme" with a "nonpunitive" legislative intent. *Id.* at 342–44. Ignoring this holding, the majority adopts a "heads I win, tails you lose" approach. On the one hand, SBM (arguably) can be applied consistently with the constitutional prohibition against ex post facto laws because it is non-punitive. On the other hand, SBM (arguably) can be applied consistently with the Fourth Amendment's protection against unreasonable searches and seizures because it is a lesser form of punishment. The State should not be afforded the opportunity to have its cake and eat it too. Having decided *Bowditch*, this Court should adhere to its conclusions about the SBM program's purpose and effect. The SBM program cannot be justified as a substitute for a more intrusive form of criminal punishment because SBM is not a form of criminal punishment.

**B.      The majority's sweeping opinion is untethered to the facts.**

¶ 59      Second, the majority goes far beyond the issue presented by the facts in this

---

[5] To reiterate, Mr. Hilton will not be required to enroll in SBM for life because of the changes to the SBM program contained in S.L. 2021-138. Additionally, as stated above, reducing the period of time an offender will be required to enroll in SBM from life to ten years has significant implications for our examination of SBM's constitutionality as applied to Mr. Hilton or to any other similarly situated individual. However, for the purposes of illustrating the errors in the majority's constitutional analysis, I adopt the majority's premise that Mr. Hilton will be required to enroll in SBM for the remainder of his life.

case. The majority declares that any offender who has committed an aggravated offense may constitutionally be ordered to enroll in SBM for life, whether currently under state supervision or not. Yet Mr. Hilton's present status as someone under the supervision of the Division of Adult Corrections has immense constitutional ramifications. Because he has not completed his sentence, Mr. Hilton arguably has a lesser privacy interest under the Fourth Amendment than someone who has completed his sentence and re-entered society. *See Grady III*, 372 N.C. at 533 ("[T]here is no precedent for the proposition that persons . . . who have served their sentences and whose legal rights have been restored to them (with the exception of the right to possess firearms . . . nevertheless have a diminished expectation of privacy in their persons and in their physical locations at any and all times of the day or night for the rest of their lives."). Mr. Hilton could also be required to participate in electronic monitoring as a condition of his post-release supervision independent of the sex-offender statute at issue here. *See* N.C.G.S. § 15A-1368.4(e)(13) (2019). He is not similarly situated to every aggravated offender subject to a lifetime SBM order. The majority errs in proceeding as if he is.

¶ 60    The majority repeatedly characterizes this Court's opinion in *Grady III* as limited or narrow. This characterization is correct, to a point: the holding of *Grady III* was carefully tailored to the facts before the Court at that time, although it was not so limited or narrow as to have no applicability in any case involving an individual

who is not a recidivist. *See Grady III,* 372 N.C. at 545. Regardless, it is the majority's (mis)characterization of *Grady III* as being so limited and so narrow that it has no applicability beyond the specific facts of that case which allows the majority to pretend a precedent we established in 2019 simply does not exist.

¶ 61        Yet, for some reason, the majority now feels completely unburdened by our longstanding norms of judicial modesty and by constitutional constraints on judicial power. Rather than issue an opinion limited to the category of offenders implicated by the facts of this case—aggravated offenders who are currently under State supervision and control—the majority feels entitled to opine on categories of individuals who differ from Mr. Hilton in constitutionally salient ways. Rather than wait for a case that presents the issue of whether SBM is constitutional as applied to an offender who is no longer subject to State supervision and control,[6] the majority eagerly jumps at the chance to try to immunize a soon-to-be-outdated version of the SBM program from constitutional challenge in every conceivable circumstance. Our role as judges has traditionally meant avoiding broad, facial holdings when a narrow, case-specific one will suffice. *See Kirkman v. Wilson*, 328 N.C. 309, 312 (1991) ("The

---

[6] The majority rests heavily on the fact that because SBM is a civil judgment (except when it is not), a defendant who is subject to SBM but no longer subject to State supervision or control may move "the court . . . [to] relieve [him] from a final . . . [SBM] order . . . for . . . [a]ny . . . reason justifying relief from the operation of the judgment." N.C.G.S. § 1A-1, Rule 60(b)(6) (2019). Of course, it flips the Fourth Amendment on its head to affirm an order allowing the State to effectuate what may very well be an unconstitutional search on the promise that an individual could someday get back into court.

function of appellate courts . . . is not to give opinions on merely abstract or theoretical matters." (alteration in original)). There is no justification for abandoning this rule in this case.

**C. The majority improperly excuses the State from its burden of demonstrating the efficacy of the SBM program.**

¶ 62        Third, the majority's Fourth Amendment analysis rests on factual conclusions it draws out of thin air. A warrantless search is only constitutional if it is reasonable. *See, e.g.*, *Riley v. California*, 573 U.S. 373, 381–82 (2014). Reasonableness requires an examination of "the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Grady v. North Carolina*, 575 U.S. 306, 310 (2015) (per curiam). The Fourth Amendment places the burden on the State to prove that the search is reasonable, not on the individual being searched to prove that it is not. *Grady III*, 372 N.C. at 543 ("[T]he State bears the burden of proving the reasonableness of a warrantless search."). If a search does not effectively advance the interest the State invokes to justify it, then it is hard to fathom how the search could be reasonable, no matter how weighty the State's interest. Thus, adhering to United States Supreme Court precedent, we held in *Grady III* that we must "consider the nature and immediacy of the governmental concern at issue here, *and the efficacy of this means for meeting it.*" 372 N.C. at 538 (emphasis added) (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 660 (1995)).

¶ 63        It is undisputed that in this case, the State did not present any evidence to

support its assertion that imposing lifetime SBM deters sex offenders from committing future sex crimes. In the face of that stark evidentiary void, the majority is willing to lend a helping hand. According to the majority, "[t]he SBM program furthers [the State's asserted] interest by deterring recidivism and assisting law enforcement agencies in solving crimes." To be clear, there is not actually any evidence in the record demonstrating the efficacy of SBM, either categorically or specifically in this case. The empirical studies the majority relies upon were not introduced by the State at Mr. Hilton's initial SBM hearing. They were not even cited by the State on appeal. Mr. Hilton did not have an opportunity to dispute the efficacy of SBM by introducing his own studies or critiquing the ones the majority finds persuasive. *See, e.g., Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 202 n.20 (2008) ("Supposition . . . is not an adequate substitute for admissible evidence subject

to cross-examination in constitutional adjudication.").[7] It is difficult to imagine a more glaring example of an "impermissible exercise of appellate factfinding," *In re Harris Teeter, LLC*, 2021-NCSC-80, ¶ 34, than the majority making two studies the parties did not cite in any proceeding below the linchpin of its analysis.

¶ 64        In further support of its conclusion regarding the efficacy of SBM, the majority claims that "[j]ust as the drug-testing policy in *Vernonia* serves as an effective deterrent with respect to student athletes categorically, the SBM program in the present case serves as an effective deterrent with respect to aggravated offenders categorically." This analogy does not hold up. The efficacy of a program for drug testing students is "self-evident" because the only thing the program needs to do is identify the presence or absence of drugs in a student's system. See *Vernonia*, 515 U.S. at 663. Provided that the tests are accurate, there is simply no disputing that a

---

[7] This Court specifically rejected the argument that the deterrence effect of SBM was self-evident in *Grady III* in part because the social science research available at the time that case was decided indicated that "applications of electronic monitoring as a tool for reducing crime are not supported by existing data." *State v. Grady* (*Grady III*), 372 N.C. 509, 543 n. 20 (2019) (quoting Deeanna M. Button et al., *Using Electronic Monitoring to Supervise Sex Offenders: Legislative Patterns and Implications for Community Corrections Officers*, 20 Crim. Just. Pol'y Rev. 414, 418 (2009)). Further, the studies the majority relies upon in support of its conclusion that "SBM's efficacy as a deterrent is supported by empirical data" both involved a California-specific program requiring intensive supervision of parolees. One of the studies found that the likelihood of a parolee violating the conditions of his or her parole or reoffending correlated significantly with a parole officer's caseload, leading the researchers to recommend "smaller caseloads of no more than 20 people per officer." Philip Bulman, *Sex Offenders Monitored by GPS Found to Commit Fewer Crimes*, 271 NIJ J. 22 (Feb. 2013). This conflicting empirical data further undermine the majority's assertion that the efficacy of lifetime SBM is "self-evident" and illustrate the need for these evidentiary issues to be addressed in the first instance by the trial court.

program which regularly subjects students to drug testing—and promises they will be punished if they test positive—serves the government's interest in deterring student drug use.[8]

¶ 65　　By contrast, the link between lifetime SBM and recidivism is far more complex. Even in this case, the most the State's witness could offer was to answer in the affirmative when asked "*hypothetically* if the first time [Mr. Hilton] went to Caldwell County he had no contact with [the victim], then you *possibly*, if in fact an assault did occur, you *might* have been able to avoid that with satellite-based monitoring?" Lifetime enrollment in SBM "[h]ypothetically," "possibly," "might" have helped deter a crime allegedly committed by an aggravated offender still subject to post-release supervision. This is hardly the kind of ringing endorsement one would expect of a proposition the majority suggests is self-evident.

¶ 66　　It may seem pedantic to hold the State to its burden of proving that the SBM program effectively deters sex offenders from committing future sex crimes, and maybe it would be, if the only interest implicated here was the State's interest in

---

[8] Further, in *Vernonia*, the United States Supreme Court went out of its way to "caution against the assumption that suspicionless drug testing will readily pass constitutional muster in other contexts. The most significant element in this case is the first we discussed: that the Policy was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 665 (1995). The majority's willingness to cherry-pick and expand *Vernonia*'s limited, context-specific holding—which involved very different circumstances and very different interests—stands in stark contrast to its disavowal of *Grady III* based upon its convenient view of that decision's limits.

promoting public safety. After all, it certainly seems possible that strapping a plastic box to a person's leg in order to collect location data in perpetuity will deter that person from committing future crimes. The problem with this view is that the State's interest is not and cannot be the only interest that matters when evaluating the scope of protection afforded to North Carolinians under our state and federal constitutions.

When we allow the State to define for itself when a presumptively unreasonable search is reasonable, we place all North Carolinians' constitutional rights at risk. After all, the Fourth Amendment safeguards "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures" *by the government*. U.S. Const. amend. IV. Preventing law enforcement officers and other government officials from acting unlawfully is "[t]he point of the Fourth Amendment." *Johnson v. United States*, 333 U.S. 10, 13 (1948). The State could have presented evidence to support its assertion that SBM promotes its legitimate governmental interest in preventing sex offenders from reoffending. It did not. That should end our inquiry. Yet rather than hold the State to this very much surmountable burden, the majority excuses the State's inability or unwillingness to present any evidence demonstrating that SBM helps deter recidivism and instead invents a new test: a warrantless, suspicionless search is reasonable when the State says it is. The danger for abuse should be self-evident.

**D. The majority's flagrant disregard for precedent.**

¶ 68        Finally, the majority has adopted numerous arguments advanced in the dissenting opinion in *Grady III* which the majority in that case rejected. Key factual and legal conclusions established in *Grady III* have been turned upside down. Without acknowledgment, the majority proceeds as if the dissent in *Grady III* controls in analyzing the constitutionality of a lifetime SBM order under the Fourth Amendment.[9] The majority's refusal to adhere to precedent is inconsistent with this Court's longstanding respect for the doctrine of stare decisis, creates unnecessary and inexplicable fissures in our Fourth Amendment jurisprudence, and threatens this Court's legitimacy.

¶ 69        On numerous occasions, the majority opinion in this case discards legal principles articulated by the majority in *Grady III* which plainly apply in examining any offender's challenge to an order imposing lifetime SBM, including Mr. Hilton's. For example, in *Grady III*, we explained that "[i]n addressing the search's 'intrusion on the individual's *Fourth Amendment* interests,' '[t]he first factor to be considered is the nature of the privacy interest upon which the search here at issue intrudes,' or, in other words, 'the scope of the legitimate expectation of privacy at issue.' " *Grady*

---

[9] To be sure, the majority does not expressly or impliedly overrule *Grady III*. Thus, its holding that it is unconstitutional under the Fourth Amendment to require certain offenders to enroll in lifetime SBM remains binding precedent, at least with respect to the category of offenders addressed in that case.

*III,* 372 N.C. at 527 (second alteration in original) (emphasis added) (quoting *Vernonia,* 515 U.S. at 652–54, 658). Now, the majority decides instead that "[t]he first step of our reasonableness inquiry under the totality of the circumstances requires analyzing the legitimacy of the State's interest."

¶ 70 In assessing the State's interest in *Grady III*, this Court held that "the extent of a problem justifying the need for a warrantless search cannot simply be assumed; instead, the existence of the problem and the efficacy of the solution need to be demonstrated by the government." *Id.* at 540–41. We explicitly rejected the argument that "we must defer to . . . legislative findings concerning the significance of the problem the SBM program is intended to address and the risk of sex offenders re-offending as codified at N.C.G.S. § 14-208.5 (stating the 'Purpose' of Article 27A) despite the absence of any record evidence supporting the State's position." *Id.* at 541–42. We found an inconsistency between the record evidence in that case and the relevant legislative findings and further noted that the referenced "findings" related to the sex offender registry, not the SBM program. *Id.* Today, the majority relies on the exact same legislative statement of purpose to support the factual conclusion that sex offenders pose a high risk of reoffending.

¶ 71 A central question in the constitutional analysis and one that should be of concern to all is whether the SBM program actually accomplishes the purposes it is intended to achieve. On this fundamental issue of efficacy, in *Grady III* this Court

again explicitly rejected the position now adopted by the majority that the program's deterrent effect is self-evident. *See Id.* at 543–44 ("[T]he State has not presented any evidence demonstrating that the SBM program is effective at deterring crime. . . . We cannot simply assume that the program serves its goals and purposes . . . .").

¶ 72 Another example of the majority's abandonment of *Grady III* when conducting the balancing required under the Fourth Amendment's reasonableness inquiry is its characterization of the intrusiveness of the search SBM effectuates. In *Grady III,* this Court explicitly rejected the State's argument that "[t]he physical intrusion here is minimal," *id.* at 536 (alteration in original), concluding instead that the physical intrusiveness of SBM is both distinct in nature from the requirements of the sex offender registry and substantial*, id.* at 537. We stated that "[w]e cannot agree with the Court of Appeals that these physical restrictions, [like charging the ankle monitoring device,] which require defendant to be tethered to a wall for what amounts to one month out of every year, are 'more inconvenient that intrusive.' " *Id.* at 535–36 (footnote omitted) (quoting *State v. Grady*, 259 N.C. App. 664, 672 (2018)). Today, the Court holds, directly contra *Grady III*, that "[t]hese physical limitations are more inconvenient than intrusive and do not materially invade an aggravated offender's diminished privacy expectations." SBM technology has not changed. The requirement that the person wearing an ankle monitoring device must be tethered to the wall for two hours a day to charge the battery has not changed. The fact that an audible sound

is emitted when voice commands are made has not changed. And there is no difference in the level of intrusiveness of SBM for an individual who is a recidivist as compared to an aggravated offender.

¶ 73     On the question of whether a court order to enroll in lifetime SBM is easily terminated, the *Grady III* Court examined the significance of the fact that North Carolina law provides for review by the Post-Release Supervision and Parole Commission and found several practical and constitutional problems with this purported remedy. *Id.* at 534–35, 534 n.16. We noted that from 2010 through 2015 the Commission received only sixteen requests for termination by individuals subject to lifetime SBM and denied all of them. *Id.* at 535. The majority now makes the completely unsupported factual assumptions that "the aggravated offender category applies only to a small subset of individuals" and that while the statute refers to "lifetime" monitoring, termination is practically available after one year.

¶ 74     Similarly, with regard to Mr. Hilton's state constitutional claim, the majority relies upon reasoning rejected by the United States Supreme Court and by this Court in the *Grady* cases. The majority concludes that an order imposing mandatory lifetime SBM is not a general warrant, and is thus constitutional, because SBM only provides information about a person's location. Yet this requires embracing a characterization of the SBM program as not actually effectuating a constitutional search—a characterization the United States Supreme Court unanimously overruled

in a per curiam opinion. The majority's fact-free, tautological reasoning has the effect of nullifying any meaningful judicial review of claims arising under Article I, Section 20 of the North Carolina Constitution altogether.

¶ 75      I could go on. But proceeding issue by issue to examine all the ways in which this Court is now disavowing *Grady III,* without acknowledging what it is doing or even trying to justify its norm-breaking opinion, risks missing the forest for the trees. Nothing about SBM or the Fourth Amendment has changed between our decision in *Grady III* and the decision today. The only thing that has changed is the composition of the Court.

¶ 76      In refusing to adhere to *Grady III*, the majority ignores the dozens of Court of Appeals decisions interpreting and applying *Grady III*'s logic in cases involving non-recidivists. *See, e.g., State v. Perez*, 854 S.E.2d 15, 21 (N.C. Ct. App. 2020) ("Since our Supreme Court's holding in *Grady III*, this Court has applied the reasonableness analysis under the totality of the circumstances to non-recidivists in SBM appeals in accordance with *Grady I.*"); *Gordon*, 270 N.C. App. at 475–77 (applying the reasonableness analysis employed in *Grady III* to a defendant convicted of an aggravated offense and subject to lifetime SBM as a result); *State v. Griffin*, 270 N.C. App. 98, 106 (2020) ("*Grady III* offers guidance as to what factors to consider in determining whether SBM is reasonable under the totality of the circumstances."), *review allowed, writ allowed,* 854 S.E.2d 586 (N.C. 2021); *Jackson*, 2020 WL 2847885,

at \*16 ("Defendant is an aggravated offender subject to mandatory lifetime SBM following his release from incarceration, placing his circumstances outside of the limited facial holding of *Grady III*. Accordingly, as we did in *Griffin* . . . , we employ *Grady III* as a roadmap . . . ."). This Court is not bound by Court of Appeals decisions, but the majority's failure to explain why *Grady III* is inapposite in a case applying Fourth Amendment principles to examine the constitutionality of a lifetime SBM order—contrary to the reasoning of every Court of Appeals panel which has considered the very same question—is inexcusable.[10]

¶ 77          Ostensibly, our Court adheres to the doctrine of stare decisis. *See, e.g., In re T.A.M.*, 2021-NCSC-77, ¶ 61 (Ervin, J. dissenting) ("[T]hose who disagree with an earlier decision are expected to continue to adhere to it unless and until it is overruled."). "This Court has always attached great importance to the doctrine of *stare decisis*, both out of respect for the opinions of our predecessors and because it promotes stability in the law and uniformity in its application." *Wiles v. Welparnel Constr. Co.*, 295 N.C. 81, 85 (1978). Indeed, respect for our own precedents is necessary for us to remain faithful to the rule of law.

---

[10] The majority states that *Grady III* "has no bearing on cases where lifetime SBM is imposed on sexually violent offenders, aggravated offenders, or adult-child offenders" because the decision was limited to a narrow class of recidivists. But the majority does little to explain the distinction between recidivists and aggravated offenders which justifies discarding the reasoning we articulated in *Grady III*. Again, the Fourth Amendment and the SBM statutes which govern the lawfulness of subjecting an individual to lifetime SBM are the same for recidivists and aggravated offenders.

> This rigorous standard for constitutional challenges ensures uniformity and predictability in the application of our constitution. *State v. Emery*, 224 N.C. 581, 584, 31 S.E.2d 858, 861 (1944) ("[Constitutions] should receive a consistent and uniform construction . . . even though circumstances may have so changed as to render a different construction desirable." (citing*, inter alia, State ex rel. Att'y-Gen. v. Knight*, 169 N.C. 333, 85 S.E. 418 (1915))); *see also Bacon v. Lee*, 353 N.C. 696, 712, 549 S.E.2d 840, 851– 52 ("A primary goal of adjudicatory proceedings is the uniform application of law. In furtherance of this objective, courts generally consider themselves bound by prior precedent, *i.e.*, the doctrine of stare decisis." (citations omitted)), *cert. denied,* 533 U.S. 975, 122 S. Ct. 22, 150 L. Ed. 2d 804 (2001). Adhering to this fixed standard ensures that we remain true to the rule of law, the consistent interpretation and application of the law. *State v. Bell*, 184 N.C. 701, 720, 115 S.E. 190, 199 (1922) (Stacy, J., dissenting) ("[T]here must be some uniformity in judicial decisions . . . or else the law itself, the very chart by which we are sailing, will become as unstable and uncertain as the shifting sands of the sea . . . .").

*State ex rel. McCrory v. Berger*, 368 N.C. 633, 651 (2016) (Newby, J., concurring in part, dissenting in part) (alterations in original). "Our system of constitutional adjudication depends upon a vast reservoir of respect for law and courts." Archibald Cox, *The Warren Court: Constitutional Decision as an Instrument of Reform* 25 (Harvard Univ. Press 1968). Public acceptance of the legitimate authority of judicial decisions rests "at least partly upon the understanding that what the judge decides is not simply his personal notion of what is desirable but the application of rules that apply to all men equally, yesterday, today, and tomorrow." *Id.* at 26. This Court's actions today threaten to drain that "reservoir of respect for law and courts."

¶ 78    Of course, "*stare decisis* is 'not an inexorable command.' " *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2478 (2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 233 (2009)). On rare occasion, a Court will find it necessary to depart from the conclusions and reasoning it endorsed in its own prior decisions. Although this Court has not articulated factors to consider when examining the continued vitality of our precedents—perhaps because this Court has for so long respected the doctrine of stare decisis—the United States Supreme Court considers "the quality of [ ] reasoning [of the precedent being challenged], the workability of the rule it established, its consistency with other related decisions, developments since the decision was handed down, and reliance on the decision." *Id.* at 2478–79.

¶ 79    In light of these factors, what is particularly troubling about the majority's unwillingness to adhere to *Grady III* is that it comes in precisely the circumstances where respect for our precedent should be at its apex. Here, based upon a plausible reading of *Grady III*, the General Assembly expended significant time and energy to address the SBM program's constitutional deficiencies. The constitutionality of a law was challenged. This Court ruled. The General Assembly responded. This is precisely how our system of constitutional adjudication and judicial review should proceed. *Cf. Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 202 (1991) ("*Stare decisis* has added force when the legislature, in the public sphere . . . ha[s] acted in reliance on a previous decision, for in this instance overruling the decision would dislodge settled

rights and expectations or require an extensive legislative response."). The majority should not ignore a precedent it does not like, in a circumstance where doing so is both unwarranted and, given the passage of S.L. 2021-138, completely unnecessary, absent a compelling reason or any identifiable reason at all.

¶ 80        A Court which discards its own precedents without explaining why it is doing so—which refuses to even admit what it is doing—is a Court which forfeits its claim to the special legitimacy the judiciary purports to derive from its capacity to reason and persuade. That is precisely what this Court does today. In "disregarding or distorting precedent as necessary to reach their desired result," the majority flaunts its power and tells the public " '*C'est légal, parce que je le veux*' ('It is legal because it is my will.')." *State v. Robinson*, 375 N.C. 173, 193 (2020) (Newby, J., dissenting). The majority also signals to future litigants that the relevance of our decisions depends not upon any objective set of rules articulated by the Court, but rather upon the whims of its members. Whether or not one agrees with the outcome of *Grady III* or with the outcome of this case, the majority's flagrant disregard for precedent and its unwillingness to own up to its actions should be alarming to anyone in North Carolina who cares about constitutional rights and the rule of law.

## III.    Conclusion

¶ 81        It is important to not shy away from the facts of this particular case. Mr. Hilton was convicted of sexually abusing two minors. When he was released from prison

after serving a 12-year sentence, he violated a condition of his post-release supervision by traveling to Caldwell County without his probation officer's permission. He was subsequently accused of sexually assaulting another minor during at least one of these unauthorized trips. Although the State's testimony was extremely speculative, it is certainly possible that if the assault was not on his first trip and if the probation officer supervising Mr. Hilton had intervened after the first trip to stop Mr. Hilton from leaving Catawba County, then the second assault may have been avoided. Given the magnitude of the harm inflicted by individuals who commit aggravated sex offenses—and the frightening prospect of prior offenders reoffending upon their release from prison—it is tempting to allow the State to do pretty much whatever it wants in the name of deterring crime.

¶ 82      Yet without disputing the magnitude of the interest the State asserts to justify its imposition of SBM in this case, I cannot join the majority in its unqualified embrace of an application of SBM that is both unconstitutional and irreconcilable with recent precedents of this Court and the United States Supreme Court, in a case that has been significantly altered by the General Assembly's substantial revision of the SBM program. I cannot join the majority in its decision to "shr[i]nk from declaring the truth" that the constitutions of North Carolina and the United States do not permit the State to intrude upon the privacy of its citizens merely because the legislature declares the intrusion wise. *Stanmire v. Taylor*, 48 N.C. 207, 211 (1855).

Although of limited relevance, the majority opinion represents a grievous violation of our "solemn obligation" to enforce constitutional rights against State overreach. *Id.*

The practical result of the majority's holding has been nullified because, as explained above, the law the majority purports to interpret will no longer exist after 1 December 2021. Nevertheless, the majority's reasoning is troubling. According to the majority, the State would be permitted to physically affix an electronic tracker to Mr. Hilton's ankle and collect pinpoint location data from now until the day he dies, based solely upon his status as an aggravated offender, even after he has completed all terms of his criminal sentence. The majority may think this an effective way to prevent recidivism. It may very well be. But allowing the State to conduct an invasive, never-ending search of an individual's person, without requiring the State to present *any* evidence that doing so in any way serves the interest the State advances to justify the search, makes a mockery of the constitutional rights which protect all North Carolinians. I disagree with the majority's abandonment of the state and federal constitutions, its refusal to respect the Court and its precedents, and its abdication of our judicial role. If this Court believes it necessary to reach the merits of Mr. Hilton's claim absent further briefing on the ramifications of S.L. 2021-138, I would affirm the decision of the Court of Appeals reversing in part the order imposing lifetime SBM on Mr. Hilton. Therefore, I dissent.

Justice HUDSON and Justice ERVIN join in this dissenting opinion.

**Appendix:**

| Case | Category | Court of Appeals Disposition as to SBM |
|---|---|---|
| *State v. Clemons*, No. COA18-469, 2019 WL 6134546 (N.C. Ct. App. Nov. 19, 2019) (unpublished). | Non-Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Dravis*, 269 N.C. App. 617 (2020). | Lifetime (unknown category) | SBM Order Held Unconstitutional |
| *State v. Griffin*, 270 N.C. App. 98 (2020), *review allowed, writ allowed*, 854 S.E.2d 586 (N.C. 2021). | 30 years | SBM Order Held Unconstitutional |
| *State v. Gordon*, 270 N.C. App. 468 (2020), *review allowed, writ allowed*, 853 S.E.2d 148 (N.C. 2021). | Non-Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Graham*, 270 N.C. App. 478, *writ allowed*, 845 S.E.2d 788 (N.C. 2020), *review allowed in part, denied in part*, 375 N.C. 272 (2020). | Non-Recidivist Lifetime | Vacated and Remanded |
| *State v. Willis*, No. COA18-507, 2020 WL 2126759 (N.C. Ct. App. May 5, 2020) (unpublished). | Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Ricks*, 271 N.C. App. 348, *writ allowed*, 375 N.C. 281 (2020). | Non-Recidivist Lifetime | SBM Order Vacated |
| *State v. Jackson*, No. COA18-1122, 2020 WL 2847885 (N.C. Ct. App. June 2, 2020) (unpublished), *review denied*, 375 N.C. 494 (2020). | Non-Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Hutchens*, 272 N.C. App. 156 (2020). | Non-Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Tucker*, 272 N.C. App. 223, *writ denied*, 843 S.E.2d 647 (N.C. 2020), *review denied*, 376 N.C. 546 (2020). | Non-Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Springle*, No. COA17-652-2, 2020 WL 4187312 (N.C. Ct. App. July 21, 2020) (unpublished). | Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Lindquist*, 273 N.C. App. 163 (2020). | Recidivist Lifetime | SBM Order Vacated and Remanded |
| *State v. Thompson*, 273 N.C. App. 686 (2020). | Non-Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Strudwick*, 273 N.C. App. 676 (2020), *writ allowed*, 849 S.E.2d 296 (N.C. 2020). | Non-Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Ennis*, No. COA19-896, 2020 WL 5902804 (N.C. Ct. App. Oct. 6, 2020) (unpublished), *review denied*, 851 S.E.2d 49 (N.C. 2020). | Non-Recidivist Lifetime | SBM Order Vacated |
| *State v. Battle*, No. COA19-677, 2020 WL 6140629 | Non-Recidivist | SBM Order |

| | | |
|---|---|---|
| (N.C. Ct. App. Oct. 20, 2020) (unpublished). | Lifetime | Vacated |
| *State v. Cooper*, No. COA18-637-2, 2020 WL 6140636 (N.C. Ct. App. Oct. 20, 2020) (unpublished). | Non-Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Anthony*, No. COA18-1118-2, 2020 WL 6742712 (N.C. Ct. App. Nov. 17, 2020) (unpublished). | Non-Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Essary*, No. COA19-917, 2020 WL 7038839 (N.C. Ct. App. Dec. 1, 2020) (unpublished), *review denied*, 376 N.C. 902 (2021). | Non-Recidivist Lifetime | SBM Order Vacated |
| *State v. Harris,* 854 S.E.2d 51 (N.C. Ct. App. 2020), *writ allowed*, 376 N.C. 679 (2021). | Non-Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Perez,* 854 S.E.2d 15 (N.C. Ct. App. 2020). | Non-Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Robinson*, 854 S.E.2d 407 (N.C. Ct. App. 2020). | Non-Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Westbrook,* No. COA18-32-2, 2020 WL 7973944 (N.C. Ct. App. Dec. 31, 2020) (unpublished). | Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. White*, No. COA18-39-2, 2020 WL 7974418 (N.C. Ct. App. Dec. 31, 2020) (unpublished). | 10 years | SBM Order Held Unconstitutional |
| *State v. Clark*, No. COA19-318, 2020 WL 7974412 (N.C. Ct. App. Dec. 31, 2020) (unpublished). | Non-Recidivist Lifetime | SBM Order Held Unconstitutional |
| *State v. Chaudoin*, No. COA20-340, 2021 WL 1978943 (N.C. Ct. App. May 18, 2021) (unpublished). | Recidivist Lifetime | SBM Order Vacated and Remanded |
| *State v. Spinks*, 2021-NCCOA-218. | Recidivist Lifetime | SBM Order Reversed in Part and Remanded |
| *State v. Billings*, 2021-NCCOA-306. | Recidivist Lifetime | SBM Order Vacated |
| *State v. Barnes*, 2021-NCCOA-304. | Non-Recidivist Lifetime | SBM Order Vacated and Remanded |